UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

FRIENDS OF THE EAST HAMPTON AIRPORT, INC.,
ANALAR CORPORATION, HELICOPTER
ASSOCIATION INTERNATIONAL, INC.,
HELIFLITE SHARES LLC, LIBERTY                                    Docket No.
HELICOPTERS, INC., and
SHORELINE AVIATION, INC.,

                                     Plaintiffs,            COMPLAINT

       -against-

THE FEDERAL AVIATION ADMINISTRATION and
MICHAEL P. HUERTA, FAA Administrator, in his official
capacity,

                                       Defendants.

-----------------------------------------------------------------------x

       Plaintiffs Friends of the East Hampton Airport, Inc., Analar Corporation,

Helicopter Association International, Inc., Heliflite Shares LLC, Liberty Helicopters,

Inc., and Shoreline Aviation, Inc. (collectively, "Plaintiffs"), by their undersigned

attorneys,  allege as follows:

## Introduction

      1.     This action seeks declaratory and injunctive relief against the Federal

Aviation Administration ("the FAA") and its Administrator, Michael P. Huerta

(collectively, "Defendants"), to redress Defendants' abdication of their statutory duties

and *ultra vires* conduct with regard to East Hampton Airport, a federally funded, public-

use airport located in Suffolk County, New York.

2. As the FAA itself has expressly acknowledged in other proceedings:

    (a) the FAA is required by the Airport and Airway Improvement Act of 1982 (the "AAIA"), as amended, 49 U.S.C. § 47101, *et seq.*, to enforce certain mandatory conditions, known as "grant assurances," that are a condition precedent to an airport's receipt of federal funds;

    (b) the FAA cannot settle litigation by "bargain[ing] away" the right of access to federally funded airports or by waiving enforcement of grant assurances; and

    (c) the FAA cannot "abdicate [its] responsibility" to enforce a federally funded airport's "statutory obligations under the grant assurances" by signing an agreement to waive enforcement of the grant assurances.

3. Yet, with respect to East Hampton Airport, the FAA has confirmed that it intends to adhere to a settlement agreement entered into by the FAA and a local community group that was, by the FAA's own assessment of its statutory obligations, an unlawful act – namely, the bargaining away of the right of access to a federally funded airport and abdication of the FAA's responsibility to enforce certain grant assurances, including the requirement (known as Grant Assurance 22.a) that the Town of East Hampton make East Hampton Airport "available for public use on reasonable conditions and without unjust discrimination" to different airport users and types of aircraft.

4. More specifically, and despite the fact that the Town of East Hampton is required as a matter of both statute and contract to comply with various grant assurances (including Grant Assurance 22.a) until September 25, 2021, the FAA has confirmed in writing to U.S. Representative Timothy Bishop that it intends to adhere to a 2005 settlement agreement – to which neither East Hampton Airport, the Town of East Hampton, nor Plaintiffs in this action were parties – under which the FAA agreed that it

would not enforce certain of East Hampton's grant assurances (including Grant Assurance 22.a) after December 31, 2014.

5.      In addition, and despite the FAA's statutory obligation to enforce the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. § 47521, *et seq*., which requires U.S. airports to follow certain procedural requirements before imposing any new airport noise and access restrictions, the FAA has made clear that it interprets the 2005 settlement agreement as requiring it to refrain from taking action in response to complaints that the Town of East Hampton has violated ANCA's procedural requirements.  As a result, the FAA has stated in writing to Congressman Bishop that the Town of East Hampton need not comply with ANCA's procedural requirements unless it wishes to remain eligible for the receipt of future federal funding.

6.      The FAA's position – which took effect on January 1, 2015 – appears to be premised entirely on the FAA's belief that the 2005 settlement agreement legally ties the FAA's hands, and prospectively strips the FAA of jurisdiction to enforce the law and adjudicate certain third-party complaints regarding East Hampton Airport.  The FAA is wrong.

7.       Defendants' refusal to enforce the mandatory requirements of the AAIA and ANCA with regard to East Hampton Airport constitutes not only an unlawful abdication by Defendants of their statutory duties, but also an arbitrary and capricious policy adopted by Defendants with regard to East Hampton Airport that contravenes the FAA's policies and practices of applying those same laws to other U.S. airports.

8.      In reliance upon the FAA's stated position, which has created a law enforcement void, the Town of East Hampton has made clear in public statements that it

intends to move forward with noise and access restrictions for East Hampton Airport that the FAA – were it enforcing the AAIA – would in all likelihood prohibit, in whole or in part, as unjustly discriminatory and unreasonable.  The Town of East Hampton has further made clear that it intends to accept the FAA's invitation to ignore ANCA by imposing noise and access restrictions without the notice and comment period mandated by that statute.

9.      Because neither the AAIA nor ANCA provides for a private right of action, Defendants' refusal to enforce those statutes with respect to East Hampton Airport leaves Plaintiffs with no means to receive the protections afforded to them under those statutes other than by suit against Defendants in this Court.

10.     Plaintiffs accordingly seek declaratory and injunctive relief from this Court confirming that:

(a)     Defendants are required to ensure that the Town of East Hampton complies with the grant assurances at issue until September 25, 2021;

(b)     Neither the 2005 settlement agreement nor Defendants' interpretation of that agreement as reflected in their writing to Congressman Bishop can be a lawful basis, in whole or part, for Defendants' prospective determination of whether and how to enforce the grant assurances or adjudicate administrative complaints regarding East Hampton Airport; and

(c)     Defendants' stated position that the Town of East Hampton need not comply with ANCA is contrary to law.

**The Parties**

11.     Plaintiff Friends of the East Hampton Airport, Inc. ("FOEHA") is a non-profit corporation organized and existing under the laws of the State of New York, and located in Suffolk County.  FOEHA represents the interests of local and regional fixed wing aircraft and helicopter owners, operators, lessors, pilots and their passengers and

4

customers, and local businesses that seek to keep East Hampton Airport open to all types, kinds and classes of aircraft activities and flying services, including but not limited to propeller aircraft, turbine aircraft and helicopters, including those for hire.

12.     Plaintiff Analar Corporation ("Analar") is a New Jersey corporation located in Princeton, New Jersey.  Analar is a Part 135 charter operator (under the FAA regulations found at 14 C.F.R. Part 135), operating rotorcraft charter flights in New Jersey, New York and between New York City and the Hamptons.  Analar uses East Hampton Airport to provide air transportation by helicopter.

13.     Plaintiff Helicopter Association International, Inc. ("HAI") is a Delaware corporation located in Alexandria, Virginia.  HAI is a trade association that represents and serves the interests of helicopter operators around the world.  Its members include one or more providers of helicopter services at East Hampton Airport.

14.     Plaintiff Heliflite Shares LLC ("Heliflite") is a Delaware limited liability company located in Newark, New Jersey.  Heliflite is a Part 135 charter operator that uses East Hampton Airport to provide air transportation by helicopter.

15.     Plaintiff Liberty Helicopters, Inc. ("Liberty") is a New York corporation, located in Kearny, New Jersey.  Liberty is a Part 135 charter operator that uses the East Hampton Airport to provide air transportation by helicopter.

16.     Plaintiff Shoreline Aviation, Inc. ("Shoreline") is a Connecticut corporation located in East Haven, Connecticut.  Shoreline is a Part 135 operator that uses the East Hampton Airport to provide charter air transportation by seaplane.

17.     Defendant Federal Aviation Administration ("FAA") is a federal agency organized within the Department of Transportation.

18.     Defendant Michael P. Huerta, who is named here solely in his official capacity as Administrator of the FAA, is responsible for the administration, operations, and activities of the FAA.

## Jurisdiction and Venue

19.     This Court has jurisdiction over this action for declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201, 28 U.S.C. § 1331, and this Court's inherent equitable powers.

20.     Venue lies in this District because East Hampton Airport is in this District, the events giving rise to the claims made herein occurred in this District, and the principal place of business of one or more of the Plaintiffs is in this District.

## The Pertinent Law

21.     Congress has established the federal government's exclusive sovereignty over the airspace of the United States and preempted the field of aviation regulation in order to promote and protect a national air transportation system.

22.     Among Congress's goals in enacting federal aviation laws is to promote and encourage a competitive, privately owned United States air transport industry, and to ensure that consumers in all regions of the United States, including those in small communities, have access to affordable, regularly scheduled air service.  *See* 49 U.S.C. § 40101.

23.     It is the responsibility of the FAA to implement, enforce, and oversee the federal aviation laws.  The FAA is the agency designated by the Secretary of

Transportation to carry out the broad duties and powers assigned by Congress for the regulation of air transportation.

24.     Of particular relevance here are two federal aviation statutes – both entrusted to the FAA to enforce – regarding airport grant funding and noise control.

**A.   The Airport and Airway Improvement Act of 1982**

25.     The Airport and Airway Improvement Act of 1982 (the "AAIA"), as amended, 49 U.S.C. § 47101, *et seq*., established the Airport Improvement Program ("AIP"), a federal grant program intended to encourage the development of airports through federal funding.

26.     The authority of the Secretary of the Department of Transportation under the AAIA and related regulations is delegated to the FAA.

27.     Section 47107 authorizes the FAA to approve an airport's application for AIP grant funds "only if" the FAA receives certain written assurances from the airport sponsor, including an assurance that "the airport will be available for public use on reasonable conditions and without unjust discrimination."  49 U.S.C. § 47107(a)(1). Upon acceptance of AIP grant funding, those grant assurances become a binding obligation between the federal government and the sponsor, both statutorily and contractually.  49 U.S.C. § 47108(a).

28.     The FAA has implemented the AAIA's grant assurance requirements by, among other things, maintaining and publishing an official list of the specific assurances with which recipients of AIP grant funding must comply.  A copy of the FAA's list of assurances, in its current form, is attached hereto as Exhibit A.

29.    As expressly specified in the AAIA, one of the assurances mandated by the FAA as a condition of approving the receipt of AIP grant funds is the assurance that "the airport will be available for public use on reasonable conditions and without unjust discrimination."  49 U.S.C. § 47107(a)(1).  This specific grant assurance has been numbered by the FAA as Grant Assurance 22.a, and it is included in a series of grant assurances labeled "Economic Nondiscrimination."  *See* Exhibit A at 10.

30.    In addition, reflective of the fact that the AAIA does not impose a time limit on the assurance of economic nondiscrimination, the FAA has interpreted the AAIA as mandating that the assurance be given for the useful life of the federally funded improvement.  The FAA has also consistently taken the position that the useful life of most federally funded improvements is presumed to be 20 years, and the standard duration of Grant Assurance 22.a accordingly is 20 years from the date of acceptance of federal funding.  *See* FAA Airport Compliance Manual, FAA Order 5190.6B §§ 4.3-4.4; Exhibit A at 1; *see also, e.g.*, 53 Fed. Reg. 3104-03, 1988 WL 276277 (Feb. 3, 1988) (publicizing grant assurance duration terms).

31.    The FAA is statutorily obligated to ensure that airport sponsors comply with their grant assurances.  *See* 49 U.S.C. § 47107(g).

32.    Congress has not granted the FAA any authority to waive its responsibility to enforce the grant assurances.

**B**. **The Airport Noise and Capacity Act of 1990**

33.    The Airport Noise and Capacity Act of 1990 ("ANCA"), codified at 49 U.S.C. § 47521, *et seq*., established a national aviation noise policy, including a program

"for reviewing airport noise and access restrictions on the operations of stage 2 and stage 3 aircraft."  49 U.S.C. § 47524(a).

34.     The FAA has classified aircraft into "stages" based on the aircraft's ability to operate beneath various noise thresholds specified by the FAA.  *See generally* 14 C.F.R. § 36.  Stage 2 aircraft emit less noise than Stage 1 aircraft, for example, but more than Stage 3 aircraft.

35.     Congress enacted ANCA after determining that local efforts to mitigate aircraft noise had "led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system."  49 U.S.C. § 47521(2).  Congress decided that aviation noise policy "must be carried out at the national level."  49 U.S.C. § 47521(3).

36.     The Secretary of Transportation has delegated its statutory responsibilities to implement and enforce ANCA to the FAA.

37.     ANCA provides that an airport operator may impose an airport noise or access restriction on Stage 2 aircraft "only if" the airport operator first complies with ANCA's notice and comment procedures.  49 U.S.C. § 47524(b).  Specifically, at least 180 days before the effective date of any new restriction on Stage 2 aircraft, the airport operator must publish, for public review and comment, the proposed restriction together with the airport's cost-benefit analyses and descriptions of alternative restrictions and measures.  *Id.*

38.     ANCA's notice and comment requirements for proposed restrictions on Stage 2 aircraft are critically important as they give the FAA, aircraft operators and other affected and interested parties the opportunity to evaluate and comment on whether the

proposed restrictions would be unreasonable and unjustly discriminatory and violate the FAA's stated land use compatibility goals.

39.     Under ANCA, an airport operator may impose a restriction on Stage 3 aircraft only if (i) all of the airport's aircraft operators agree to the restriction, or (ii) the restriction has been submitted to and approved by the FAA.  49 U.S.C. § 47524(c)(1). Furthermore, the FAA may approve a proposed restriction on Stage 3 aircraft "only if" it finds, among other things, that the restriction is "reasonable, nonarbitrary, and nondiscriminatory" and does not create an unreasonable burden on interstate or foreign commerce.  49 U.S.C. § 47524(c)(2).

40.     The FAA has the power to enforce ANCA through initiation of regulatory or judicial proceedings.  49 U.S.C. § 47533; 14 C.F.R. §§ 161.501–161.505.

41.     In addition, ANCA prohibits any airport that fails to comply with its provisions from receiving federal airport development grants or imposing passenger facility charges.  49 U.S.C. § 47526; 14 C.F.R. § 161.501.

### The Pertinent Facts

**A.  The East Hampton Airport**

42.     East Hampton Airport is a public-use, federally funded airport located in or near the Town of East Hampton, Suffolk County, New York.  The Airport is owned, operated, and sponsored by the Town of East Hampton ("East Hampton").

43.     East Hampton is governed by an elected legislative body commonly referred to as the "Town Board."

44.     East Hampton Airport is important to people and businesses on Long Island and elsewhere.  It provides a variety of forms of interstate and intrastate air

transportation, including but not limited to transportation by jet plane, sea plane, and helicopter.

45.      The FAA itself has identified East Hampton Airport as a public-use airport "important to national air transportation" and has included East Hampton Airport in the FAA's 2015-2019 National Plan of Integrated Airport Systems.  *See* Federal Aviation Administration Report to Congress: National Plan of Integrated Airport Systems (NPIAS) 2015-2019, *available at* http://www.faa.gov/airports/planning_capacity/npias/reports/.

**B.  The 2001 Grant Assurances**

46.      In 2001, East Hampton applied for and accepted AIP grant funding for development of East Hampton Airport.  Specifically, on September 25, 2001, East Hampton accepted AIP grant funding in the amount of $1,410,000.

47.      Upon East Hampton's acceptance of the grant offer, the assurances required by the AAIA – including Grant Assurance 22.a – were incorporated into the grant agreement between East Hampton and the FAA and became binding obligations on East Hampton and the federal government.

48.       East Hampton is obligated to comply with Grant Assurance 22.a for 20 years from the date of its acceptance of the offer of federal funds – *i.e.*, until September 25, 2021.

**C.  The 2005 Settlement Agreement**

49.      Between approximately 2001 and 2003, an unincorporated association of individuals living near East Hampton Airport, who called themselves the "Committee to Stop Airport Expansion" (hereafter, "the Committee"), initiated various legal actions in an attempt to stop expansion of East Hampton Airport.

50.     One of those actions – *Committee to Stop Airport Expansion v. Department of Transportation*, Docket No. 03-2634 (E.D.N.Y. 2003) – was filed in this District (the "EDNY Action").   The EDNY Action challenged the legality of the FAA's approval of East Hampton's 2001 airport layout plan.   The named plaintiffs in the EDNY Action were the Committee and three Committee members.   The named defendants were the FAA and its Administrator, and the Department of Transportation and its Secretary.

51.     Neither East Hampton nor the East Hampton Airport were parties to the EDNY Action.   The Plaintiffs in the instant action were likewise not parties to the EDNY Action.

52.     In 2005, the parties in the EDNY Action executed a settlement agreement that provided for that lawsuit's dismissal, as well as for the dismissal of certain other litigation and proceedings the Committee had commenced in other fora.   A copy of the settlement agreement is attached hereto as Exhibit B (the "2005 Settlement Agreement").

53.     In the 2005 Settlement Agreement, the FAA agreed not to enforce grant assurances 22.a and 22.h (hereafter, the "Nondiscrimination Grant Assurances") and 29.a and 29.b (hereafter, "the Airport Layout Plan Grant Assurances") with respect to East Hampton Airport after December 31, 2014.   Specifically, the Paragraph 7 of the Agreement provides:

"Defendant FAA agrees, with respect to East Hampton Airport grants issued prior to the effective date of this Agreement, that the following grant assurances will not be enforced beyond December 31, 2014:

- It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport (grant assurance 22.a.).

- The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport (grant assurance 22.h).

- It will keep up to date at all times an airport layout plan of the airport . . . . Such airport layout plans and each amendment, revision, or modification thereof, shall be subject to the approval of the Secretary . . . . The sponsor will not make or permit any changes or alterations in the airport or any of its facilities which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport (grant assurance 29.a.).

- If a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary; (1) eliminate such adverse effect in a manner approved by the Secretary; or (2) bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities (grant assurance 29.b.)."

Exhibit B, ¶ 7.

54.     The 2005 Settlement Agreement further provides that, other than the Nondiscrimination and Airport Layout Plan Grant Assurances, "[a]ll other grant assurances with respect to any grant awarded to East Hampton Airport . . . shall be enforced in full." *Id.*  The Agreement also provides that if the East Hampton is awarded additional AIP grant funding after the Agreement's effective date (April 29, 2005), then all grant assurances will be enforced in connection with that new funding. *Id.*

55.     The 2005 Settlement Agreement contains no mention of ANCA.

56.     The District Court did not retain jurisdiction over the EDNY Action for the purpose of enforcing the 2005 Settlement Agreement, and the EDNY Action was closed by the Court in 2005.

**D.  The FAA Has Expressly Acknowledged that It Lacks Authority to
    Waive Grant Assurances or Its Statutory Grant Enforcement Obligations**

57.     At least twice since the FAA executed the 2005 Settlement Agreement, it has affirmatively acknowledged that it lacks authority to waive or bargain away AAIA-mandated grant assurances in order to resolve pending litigation.

58.     In 2007, in an administrative proceeding involving an airport located in Illinois, the FAA expressly rejected the notion that the dispute among the parties could be resolved by the FAA agreeing not to fully enforce the grant assurances binding on the airport sponsor.  *See Platinum Aviation and Platinum Jet Center BMI v. Bloomington-Normal Airport Authority, Illinois* ("*Platinum Aviation*"), FAA 16-06-09 (2007), 2007 WL 4854321, at *15 (Nov. 28, 2007).   In that action, the FAA stated:  "*FAA can neither bargain away the rights of access* [to airport facilities] *nor waive the grant assurances* of the Respondent [airport].  *FAA is required to enforce the federal statutes* to protect the federal interest in the Airport."  *Id*. at *15 (emphasis added).

59.     In 2008, in *In the Matter of Compliance with Federal Obligations by the City of Santa Monica, California* ("*Santa Monica*"), FAA 16-02-08 (2008), 2008 WL 6895776, at *26 (May 27, 2008), the FAA again acknowledged its statutory obligation to enforce the AAIA-mandated grant assurances, and its lack of statutory authority to waive that obligation.  Discussing whether a settlement agreement the FAA had previously executed with Santa Monica airport had waived grant assurances or the FAA's

jurisdiction to enforce the grant assurances, the FAA rejected the notion that such waivers could ever be permissible, stating:

- "The FAA *may not by agreement waive its statutory enforcement jurisdiction over future cases*."

- "The FAA has express jurisdiction … to conduct investigations and issue orders pertaining to … grant assurances, 49 U.S.C. § 47107. . . The FAA is the Federal agency assigned responsibility by Congress for enforcing the statutory safety and AIP grant obligations referenced in the [settlement agreement at issue].  The FAA did not *and could not abdicate that responsibility by signing an agreement* with Santa Monica that settled existing litigation."

- "*Just as the FAA cannot agree to waive its statutory enforcement jurisdiction, the agency cannot, and did not, agree to a waiver by a Federally obligated airport of its statutory obligations under the grant assurances*. . . ."

*Id.* at 26-27 (emphasis added).

60.     The FAA's statements in the *Santa Monica* and *Platinum Aviation* proceedings make clear that the FAA exceeded its authority, and engaged in an *ultra vires* act, in executing the 2005 Settlement Agreement.

61.     In the 2005 Settlement Agreement, the FAA purported to do exactly what the FAA has said it cannot do – namely, waive grant assurances and abdicate the FAA's statutory obligation to enforce those assurances in order to settle pending litigation.

**E.  Defendants' 2012 Written Responses to U. S. Representative Timothy
Bishop Confirm Their Intent to Adhere to the 2005 Settlement Agreement**

62.     Since 2005, certain residents of East Hampton have continued to press the
Town Board to impose noise and access restrictions on East Hampton Airport.  One such
group calls itself the "Quiet Skies Coalition."

63.     In or about December 2011, U. S. Representative Timothy Bishop, acting
on a request from the Quiet Skies Coalition, submitted a list of questions to Defendant
Michael Huerta, who at that time was acting FAA Administrator (and who later was
named Administrator).

64.     The questions posed by Congressman Bishop probed the FAA's position
on the legal effect of the 2005 Settlement Agreement on the FAA, and on East
Hampton's ability to impose airport access and noise restrictions after December 31,
2014.

65.     Defendants provided written responses to Representative Bishop's
questions in or about 2012 ("the Bishop Responses").

66.     Defendants' Bishop Responses were published on the Internet by the
Quiet Skies Coalition, in the form attached here as Exhibit C.

67.     The Bishop Responses confirm Defendants' position that:

(a)     The FAA regards itself as legally bound by the 2005 Settlement
Agreement  (*see* Responses No. 1, 3);

(b)     The FAA interprets the 2005 Settlement Agreement as not only
waiving its jurisdiction to enforce the Nondiscrimination Grant
Assurances, but also waiving East Hampton's obligation to comply
with the Nondiscrimination Grant Assurances after December 31,
2014 (*see* Response Nos. 1, 3, stating the Nondiscrimination Grant
Assurances "expire" after December 31, 2014);

16

(c)     After December 31, 2014, unless East Hampton receives a new AIP grant,  Defendants will not enforce the Nondiscrimination Grant Assurances under any circumstances, and will not hear or adjudicate any administrative complaint filed with the FAA regarding the East Hampton's violation of the Nondiscrimination Grant Assurances  (*see* Response No. 1); and

(d)     Despite the fact that the 2005 Settlement Agreement contains no mention of ANCA, the FAA interprets the Agreement as relieving East Hampton from compliance with ANCA's requirements in proposing new airport noise and access restrictions, unless East Hampton wishes to remain eligible to receive future federal airport funding  (*see* Response No. 1).

68.     The Bishop Responses have legal consequence to the rights and/or obligations of the FAA, East Hampton, and users of East Hampton Airport, including but not limited to aircraft operators.

**F.  Defendants' Unlawful Action is Now Ripe for Review**

69.     Until December 31, 2014, it remained possible that an intervening event – namely, the acceptance by East Hampton of additional AIP grant funding – would moot Defendants' unlawful agreement to waive enforcement of the Nondiscrimination Grant Assurances after December 31, 2014.

70.     However, East Hampton has not received additional AIP grant funding since April 2005.  Accordingly, Defendants' unlawful waiver of its enforcement jurisdiction is now ripe for review.

71.     Moreover, through resolutions and other actions taken by the Town Board, East Hampton has made clear that it regards itself as relieved of the obligation to comply with the Nondiscrimination Grant Assurances as of December 31, 2014, and that it intends to promulgate new airport noise and access restrictions in the near future that will disproportionately affect certain types of aircraft.

72.     Indeed, at a Town Board meeting on January 20, 2015, the Board stated that it intends to promulgate new restrictions by February 3, 2015, and that it is actively considering restrictions that are, by admission of a Town Board subcommittee, incompatible with the Nondiscrimination Grant Assurances.

73.     In addition, the timetable announced by the Town Board for implementation of the restrictions further makes clear that East Hampton intends to rely upon Defendants' Bishop Responses for the proposition that the 2005 Settlement Agreement relieved East Hampton of its obligation to comply with the 180-day notice provision required by ANCA for restrictions on Stage 2 aircraft.

### G. The Instant Action is the Only Means of Remedying The Law Enforcement Void Created by Defendants

74.     Because neither the AAIA nor ANCA provide for a private right of action, Plaintiffs cannot vindicate the protections to which they are entitled under those statutes through a lawsuit against East Hampton.

75.     The FAA's "formal complaint" process, set forth in 14 C.F.R. § 13.5, likewise cannot be used for complaint about the FAA's own conduct.  Section 13.5 provides that any person may file a "complaint" with the FAA Administrator regarding an alleged violation of federal aviation statutes and regulations, but that "[t]his section *does not apply* to complaints against the Administrator or employees of the FAA acting within the scope of their employment."  *Id.* (emphasis added).

76.     Further still, the FAA has confirmed in writing to a member of Congress that it will not enforce the Nondiscrimination Grant Assurances against East Hampton after December 31, 2014, and will not hear or adjudicate any administrative complaint filed with the FAA regarding East Hampton's violation of the Nondiscrimination Grant

Assurance, thereby rendering the Part 16 administrative process – which ordinarily permits a private party to petition the FAA for enforcement of grant assurances – unavailable to Plaintiffs.

77.      As a result, the instant action is the only available means for remedying the law enforcement void created by Defendants.

### H. Declaratory and Injunctive Relief is Both Appropriate and Necessary

78.      Plaintiffs include and/or represent the interests of aircraft operators and businesses that depend upon access to East Hampton Airport for their commercial livelihood, and customers that depend on access to East Hampton Airport for their air transportation needs, particularly during the summer season.

79.      Defendants' actions have deprived Plaintiffs of the protections to which they are entitled under the AAIA and ANCA.

80.      In addition, East Hampton has made plain that it intends to take full advantage of Defendants' illegal agreement not to enforce the provisions of the Nondiscrimination Grant Assurances or ANCA against East Hampton.

81.      Accordingly, invocation of this Court's declaratory and injunctive powers is both appropriate and necessary to prevent imminent harm to Plaintiffs and ongoing statutory violations by Defendants.

### FIRST CLAIM FOR RELIEF

### DEFENDANTS HAVE ABDICATED THEIR STATUTORY OBLIGATION TO ENSURE THAT EAST HAMPTON COMPLIES WITH THE NONDISCRIMINATION GRANT ASSURANCES UNTIL SEPTEMBER 25, 2021

82.      Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 81 of this Complaint.

83.     The AAIA imposes a non-discretionary duty on the FAA to award AIP grant funding "only if" the recipients provide AAIA-mandated grant assurances, including the assurance that "the airport will be available for public use on reasonable conditions and without unjust discrimination[.]"  49 U.S.C. § 47107(a)(1).

84.     The FAA has consistently interpreted the AAIA as mandating an assurance of economic nondiscrimination for the entire useful life of the federally funded improvement and has specified the presumed useful life of most such improvements to be 20 years.

85.     When the Town of East Hampton accepted AIP grant funding in September 2001, it agreed to comply with Grant Assurance 22.a for 20 years, until September 25, 2021.  Upon execution of the grant agreement, Grant Assurance 22.a became a binding obligation on East Hampton and the federal government.

86.     The AAIA imposes a non-discretionary duty on the FAA to ensure that grant recipients comply with their grant assurances.  The FAA has no statutory authority to waive its duty of ensuring an airport's compliance with the grant assurances.

87.     The FAA has expressly acknowledged, in proceedings involving other U.S. airports, that the FAA lacks authority to waive grant assurances in order to settle pending litigation.

88.     The FAA has likewise expressly acknowledged, in proceedings involving other U.S. airports, that the FAA lacks authority to waive its jurisdiction and authority to enforce grant assurances in order to settle pending litigation.

89.      The FAA exceeded its statutory authority and acted unlawfully and outside of its statutory powers when, to settle pending litigation, it agreed in Paragraph 7

of the 2005 Settlement Agreement not to enforce the Nondiscrimination Grant

Assurances after December 31, 2014.

90.     As a matter of public policy, Paragraph 7 of the 2005 Settlement

Agreement and the FAA's Bishop Responses cannot bind Defendants, and cannot prevent

them from carrying out the statutory duties imposed upon them by Congress.

91.     Defendants' actions regarding East Hampton Airport are arbitrary and

capricious and contrary to law.

92.     Defendants' actions regarding East Hampton Airport constitute a general

policy toward East Hampton Airport that amounts to an abdication of Defendants'

statutory responsibilities.

93.     Defendants' unlawful conduct has not altered the fact that East Hampton

is obligated to comply with the Nondiscrimination Grant Assurances until September 25,

2021, and that the FAA is obligated to ensure East Hampton's compliance with those

assurances.

## SECOND CLAIM FOR RELIEF

**NEITHER THE 2005 SETTLEMENT AGREEMENT NOR DEFENDANTS'
INTERPRETATION OF THAT AGREEMENT IN THE BISHOP RESPONSES
CAN BE A LAWFUL BASIS, IN WHOLE OR PART, FOR DEFENDANTS'
PROSPECTIVE DETERMINATION OF WHETHER AND HOW TO ENFORCE
THE NONDISCRIMINATION GRANT ASSURANCES OR ADJUDICATE
ADMINISTRATIVE COMPLAINTS REGARDING EAST HAMPTON AIRPORT**

94.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 93 of

this Complaint.

95.     In the  Bishop Responses, Defendants confirmed that, based on the terms

of the 2005 Settlement Agreement, they will refuse, beginning January 1, 2015, to

institute any enforcement proceeding regarding East Hampton's failure to comply with

the Nondiscrimination Grant Assurances, even if a Part 16 administrative complaint is filed by an airport user.

96.     Defendants' position appears to be based solely on their belief that, beginning January 1, 2015, the 2005 Settlement Agreement relieves East Hampton of its obligation to comply with the Nondiscrimination Grant Assurances and deprives the FAA of its jurisdiction to enforce those Grant Assurances, either at Defendants' initiation or through Defendants' investigation and adjudication of a third-party complaint.

97.     Defendants' position is contrary to law.

98.     In addition to being statutorily mandated to enforce the grant assurances, Defendants are statutorily mandated to investigate and/or adjudicate third-party complaints filed with the FAA that are reasonably grounded.  *See* 49 U.S.C. § 46101(a). Here, Defendants' position is that they will refuse to investigate or adjudicate any third-party complaint regarding East Hampton's violation of the Nondiscrimination Grant Assurances *without regard* for the underlying merits or facts of any alleged violation.

99.     By taking this position in the 2005 Settlement Agreement and Bishop Responses, Defendants have wholly deprived Plaintiffs of a meaningful and adequate means of vindicating their rights to challenge grant assurance violations by East Hampton.

100.    Paragraph 7 of the 2005 Settlement Agreement is unenforceable on public policy grounds.  It cannot prevent Defendants from complying with their statutory enforcement responsibilities.

101.    It would be unlawful for Defendants to decline to initiate an enforcement proceeding regarding East Hampton Airport on the basis of the 2005 Settlement Agreement or Bishop Responses.

102.    It would be unlawful for Defendants to refuse to hear or adjudicate a Part 16 or other administrative complaint brought by an airport user, alleging East Hampton's violation of its grant assurances or federal laws or regulations, on the basis of the 2005 Settlement Agreement or Bishop Responses.

## THIRD CLAIM FOR RELIEF

**DEFENDANTS' STATED POSITION THAT EAST HAMPTON NEED NOT COMPLY WITH ANCA UNLESS IT WISHES TO REMAIN ELIGIBLE TO RECEIVE FUTURE FEDERAL GRANT FUNDING IS CONTRARY TO LAW.**

103.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 102 of this Complaint.

104.    ANCA applies to any U.S. airport or airport operator proposing noise or access restrictions on Stage 2 or Stage 3 aircraft.

105.    Further, ANCA applies regardless of whether an airport operator has received federal grant funding.

106.    The FAA's long-standing interpretation of the relationship between ANCA's requirements and AAIA-mandated grant assurances is that ANCA and the AAIA impose separate and independent sets of legal obligations upon airport operators.

107.    Defendants have no statutory authority to advise a U.S. airport operator that it need not comply with ANCA.

108.    The FAA is responsible for enforcing ANCA's requirements.

109.    East Hampton, as operator of East Hampton Airport, is subject to ANCA's requirements.

110.    The 2005 Settlement Agreement made no mention of ANCA.

111.    Nothing in the 2005 Settlement Agreement purported to waive or affect East Hampton's obligations under ANCA.  Nor could the FAA have lawfully waived East Hampton's obligation to comply with ANCA.

112.    There is no legal basis for Defendants' stated position in the Bishop Responses that "[t]he FAA's [2005 Settlement] [A]greement not to enforce also means that unless the town wishes to remain eligible to receive future grants of Federal funding, it is not required to comply with the requirements under [ANCA]."  Exhibit C at 1.

113.    Defendants' stated position that East Hampton need not comply with ANCA unless it wishes to remain eligible for future federal grants is an arbitrary and capricious interpretation of ANCA, and contrary to law.

114.    Defendants' stated position that East Hampton need not comply with ANCA unless it wishes to remain eligible for future federal grants contravenes the clear directives of ANCA and its implementing regulations, as well as FAA policy and the FAA's implementation of ANCA as to other U.S. airports.

## PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

(a) Declare that:

    1.   Defendants are statutorily obligated to ensure that East Hampton complies with the Nondiscrimination Grant Assurances until September 25, 2021;

    2.   Neither the 2005 Settlement Agreement nor Defendants' interpretation of that Agreement in the Bishop Responses can be a lawful basis, in whole or part, for Defendants' prospective determination of whether and how to enforce the Nondiscrimination Grant Assurances or adjudicate administrative complaints regarding East Hampton Airport.

    3.   Defendants' stated position that East Hampton is not required to comply with ANCA unless it wishes to remain eligible for federal funding is contrary to law.

(b) Enter an injunction directing Defendants and their agents to act in accordance with the above declarations of law.

Dated: New York, New York
       January 29, 2015

LANKLER SIFFERT & WOHL LLP

By: _____

Lisa Zornberg (lzornberg@lswlaw.com)
Helen Gredd (hgredd@lswlaw.com)
Jonathan Lamberti (jlamberti@lswlaw.com)
500 Fifth Avenue, 34th Floor
New York, NY 10110
(212) 921-8399

EXHIBIT A

 **FAA
Airports**

# ASSURANCES

## Airport Sponsors

**A. General.**

1. These assurances shall be complied with in the performance of grant agreements for airport development, airport planning, and noise compatibility program grants for airport sponsors.

2. These assurances are required to be submitted as part of the project application by sponsors requesting funds under the provisions of Title 49, U.S.C., subtitle VII, as amended. As used herein, the term "public agency sponsor" means a public agency with control of a public-use airport; the term "private sponsor" means a private owner of a public-use airport; and the term "sponsor" includes both public agency sponsors and private sponsors.

3. Upon acceptance of this grant offer by the sponsor, these assurances are incorporated in and become part of this grant agreement.

**B. Duration and Applicability.**

1. **Airport development or Noise Compatibility Program Projects Undertaken by a Public Agency Sponsor.**

   The terms, conditions and assurances of this grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise compatibility program project, or throughout the useful life of the project items installed within a facility under a noise compatibility program project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project. However, there shall be no limit on the duration of the assurances regarding Exclusive Rights and Airport Revenue so long as the airport is used as an airport. There shall be no limit on the duration of the terms, conditions, and assurances with respect to real property acquired with federal funds. Furthermore, the duration of the Civil Rights assurance shall be specified in the assurances.

2. **Airport Development or Noise Compatibility Projects Undertaken by a Private Sponsor.**

   The preceding paragraph 1 also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of the facilities developed or equipment acquired under an airport development or noise compatibility program project shall be no less than ten (10) years from the date of acceptance of Federal aid for the project.

3.  **Airport Planning Undertaken by a Sponsor.**

Unless otherwise specified in this grant agreement, only Assurances 1, 2, 3, 5, 6, 13, 18, 25, 30, 32, 33, and 34 in Section C apply to planning projects.  The terms, conditions, and assurances of this grant agreement shall remain in full force and effect during the life of the project; there shall be no limit on the duration of the assurances regarding Airport Revenue so long as the airport is used as an airport.

**C.  Sponsor Certification.**

The sponsor hereby assures and certifies, with respect to this grant that:

1.  **General Federal Requirements.**

It will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for this project including but not limited to the following:

**Federal Legislation**

a.  Title 49, U.S.C., subtitle VII, as amended.
b.  Davis-Bacon Act - 40 U.S.C. 276(a), et seq.[1]
c.  Federal Fair Labor Standards Act - 29 U.S.C. 201, et seq.
d.  Hatch Act – 5 U.S.C. 1501, et seq.[2]
e.  Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 Title 42 U.S.C. 4601, et seq.[1][2]
f.  National Historic Preservation Act of 1966 - Section 106 - 16 U.S.C. 470(f).[1]
g.  Archeological and Historic Preservation Act of 1974 - 16 U.S.C. 469 through 469c.[1]
h.  Native Americans Grave Repatriation Act - 25 U.S.C. Section 3001, et seq.
i.  Clean Air Act, P.L. 90-148, as amended.
j.  Coastal Zone Management Act, P.L. 93-205, as amended.
k.  Flood Disaster Protection Act of 1973 - Section 102(a) - 42 U.S.C. 4012a.[1]
l.  Title 49, U.S.C., Section 303, (formerly known as Section 4(f))
m.  Rehabilitation Act of 1973 - 29 U.S.C. 794.
n.  Title VI  of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252) (prohibits discrimination on the basis of race, color, national origin);
o.  Americans with Disabilities Act of 1990, as amended, (42 U.S.C. § 12101 et seq.), prohibits discrimination on the basis of disability).
p.  Age Discrimination Act of 1975 - 42 U.S.C. 6101, et seq.
q.  American Indian Religious Freedom Act, P.L. 95-341, as amended.
r.  Architectural Barriers Act of 1968 -42 U.S.C. 4151, et seq.[1]
s.  Power plant and Industrial Fuel Use Act of 1978 - Section 403- 2 U.S.C. 8373.[1]
t.  Contract Work Hours and Safety Standards Act - 40 U.S.C. 327, et seq.[1]
u.  Copeland Anti-kickback Act - 18 U.S.C. 874.1
v.  National Environmental Policy Act of 1969 - 42 U.S.C. 4321, et seq.[1]
w.  Wild and Scenic Rivers Act, P.L. 90-542, as amended.
x.  Single Audit Act of 1984 - 31 U.S.C. 7501, et seq.[2]
y.  Drug-Free Workplace Act of 1988 - 41 U.S.C. 702 through 706.

z.   The Federal Funding Accountability and Transparency Act of 2006, as amended (Pub. L. 109-282, as amended by section 6202 of Pub. L. 110-252).

## Executive Orders

a.   Executive Order 11246 - Equal Employment Opportunity[1]
b.   Executive Order 11990 - Protection of Wetlands
c.   Executive Order 11998 – Flood Plain Management
d.   Executive Order 12372 - Intergovernmental Review of Federal Programs
e.   Executive Order 12699 - Seismic Safety of Federal and Federally Assisted New Building Construction[1]
f.   Executive Order 12898 - Environmental Justice

## Federal Regulations

a.   2 CFR Part 180 - OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement).
b.   2 CFR Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. [OMB Circular A-87 Cost Principles Applicable to Grants and Contracts with State and Local Governments, and OMB Circular A-133 - Audits of States, Local Governments, and Non-Profit Organizations].[4, 5, 6]
c.   2 CFR Part 1200 – Nonprocurement Suspension and Debarment
d.   14 CFR Part 13 - Investigative and Enforcement Procedures14 CFR Part 16 - Rules of Practice For Federally Assisted Airport Enforcement Proceedings.
e.   14 CFR Part 150 - Airport noise compatibility planning.
f.   28 CFR Part 35- Discrimination on the Basis of Disability in State and Local Government Services.
g.   28 CFR § 50.3 - U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964.
h.   29 CFR Part 1 - Procedures for predetermination of wage rates.[1]
i.   29 CFR Part 3 - Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States.[1]
j.   29 CFR Part 5 - Labor standards provisions applicable to contracts covering federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act).[1]
k.   41 CFR Part 60 - Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements).[1]
l.   49 CFR Part 18 - Uniform administrative requirements for grants and cooperative agreements to state and local governments.[3]
m.   49 CFR Part 20 - New restrictions on lobbying.
n.   49 CFR Part 21 – Nondiscrimination in federally-assisted programs of the Department of Transportation - effectuation of Title VI of the Civil Rights Act of 1964.
o.   49 CFR Part 23 - Participation by Disadvantage Business Enterprise in Airport Concessions.

p.  49 CFR Part 24 – Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs.[1][2]

q.  49 CFR Part 26 – Participation by Disadvantaged Business Enterprises in Department of Transportation Programs.

r.  49 CFR Part 27 – Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance.[1]

s.  49 CFR Part 28 – Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities conducted by the Department of Transportation.

t.  49 CFR Part 30 - Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors.

u.  49 CFR Part 32 – Governmentwide Requirements for Drug-Free Workplace (Financial Assistance)

v.  49 CFR Part 37 – Transportation Services for Individuals with Disabilities (ADA).

w.  49 CFR Part 41 - Seismic safety of Federal and federally assisted or regulated new building construction.

## Specific Assurances

Specific assurances required to be included in grant agreements by any of the above laws, regulations or circulars are incorporated by reference in this grant agreement.

## Footnotes to Assurance C.1.

[1]  These laws do not apply to airport planning sponsors.

[2]  These laws do not apply to private sponsors.

[3]  49 CFR Part 18 and 2 CFR Part 200 contain requirements for State and Local Governments receiving Federal assistance. Any requirement levied upon State and Local Governments by this regulation and circular shall also be applicable to private sponsors receiving Federal assistance under Title 49, United States Code.

[4]  On December 26, 2013 at 78 FR 78590, the Office of Management and Budget (OMB) issued  the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in 2 CFR Part 200. 2 CFR Part 200 replaces and combines the former Uniform Administrative Requirements for Grants (OMB Circular A-102 and Circular A-110 or 2 CFR Part 215 or Circular) as well as the Cost Principles (Circulars A-21 or 2 CFR part 220; Circular A-87 or 2 CFR part 225; and A-122, 2 CFR part 230). Additionally it replaces Circular A-133 guidance on the Single Annual Audit. In accordance with 2 CFR section 200.110, the standards set forth in Part 200 which affect administration of Federal awards issued by Federal agencies become effective once implemented by Federal agencies or when any future amendment to this Part becomes final. Federal agencies, including the Department of Transportation, must implement the policies and procedures applicable to Federal awards by promulgating a regulation to be effective by December 26, 2014 unless different provisions are required by statute or approved by OMB.

[5] Cost principles established in 2 CFR part 200 subpart E must be used as guidelines for determining the eligibility of specific types of expenses.

[6] Audit requirements established in 2 CFR part 200 subpart F are the guidelines for audits.

2. **Responsibility and Authority of the Sponsor.**

   a. Public Agency Sponsor:

   It has legal authority to apply for this grant, and to finance and carry out the proposed project; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required.

   b. Private Sponsor:

   It has legal authority to apply for this grant and to finance and carry out the proposed project and comply with all terms, conditions, and assurances of this grant agreement. It shall designate an official representative and shall in writing direct and authorize that person to file this application, including all understandings and assurances contained therein; to act in connection with this application; and to provide such additional information as may be required.

3. **Sponsor Fund Availability.**

   It has sufficient funds available for that portion of the project costs which are not to be paid by the United States. It has sufficient funds available to assure operation and maintenance of items funded under this grant agreement which it will own or control.

4. **Good Title.**

   a. It, a public agency or the Federal government, holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance satisfactory to the Secretary that good title will be acquired.

   b. For noise compatibility program projects to be carried out on the property of the sponsor, it holds good title satisfactory to the Secretary to that portion of the property upon which Federal funds will be expended or will give assurance to the Secretary that good title will be obtained.

5. **Preserving Rights and Powers.**

   a. It will not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in this grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor. This shall be done in a manner acceptable to the Secretary.

b.   It will not sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests in the property shown on Exhibit A to this application or, for a noise compatibility program project, that portion of the property upon which Federal funds have been expended, for the duration of the terms, conditions, and assurances in this grant agreement without approval by the Secretary. If the transferee is found by the Secretary to be eligible under Title 49, United States Code, to assume the obligations of this grant agreement and to have the power, authority, and financial resources to carry out all such obligations, the sponsor shall insert in the contract or document transferring or disposing of the sponsor's interest, and make binding upon the transferee all of the terms, conditions, and assurances contained in this grant agreement.

c.   For all noise compatibility program projects which are to be carried out by another unit of local government or are on property owned by a unit of local government other than the sponsor, it will enter into an agreement with that government. Except as otherwise specified by the Secretary, that agreement shall obligate that government to the same terms, conditions, and assurances that would be applicable to it if it applied directly to the FAA for a grant to undertake the noise compatibility program project. That agreement and changes thereto must be satisfactory to the Secretary. It will take steps to enforce this agreement against the local government if there is substantial non-compliance with the terms of the agreement.

d.   For noise compatibility program projects to be carried out on privately owned property, it will enter into an agreement with the owner of that property which includes provisions specified by the Secretary. It will take steps to enforce this agreement against the property owner whenever there is substantial non-compliance with the terms of the agreement.

e.   If the sponsor is a private sponsor, it will take steps satisfactory to the Secretary to ensure that the airport will continue to function as a public-use airport in accordance with these assurances for the duration of these assurances.

f.   If an arrangement is made for management and operation of the airport by any agency or person other than the sponsor or an employee of the sponsor, the sponsor will reserve sufficient rights and authority to insure that the airport will be operated and maintained in accordance Title 49, United States Code, the regulations and the terms, conditions and assurances in this grant agreement and shall insure that such arrangement also requires compliance therewith.

g.   Sponsors of commercial service airports will not permit or enter into any arrangement that results in permission for the owner or tenant of a property used as a residence, or zoned for residential use, to taxi an aircraft between that property and any location on airport.  Sponsors of general aviation airports entering into any arrangement that results in permission for the owner of residential real property adjacent to or near the airport must comply with the requirements of Sec. 136 of Public Law 112-95 and the sponsor assurances.

6. **Consistency with Local Plans.**

The project is reasonably consistent with plans (existing at the time of submission of this application) of public agencies that are authorized by the State in which the project is located to plan for the development of the area surrounding the airport.

7. **Consideration of Local Interest.**

It has given fair consideration to the interest of communities in or near where the project may be located.

8. **Consultation with Users.**

In making a decision to undertake any airport development project under Title 49, United States Code, it has undertaken reasonable consultations with affected parties using the airport at which project is proposed.

9. **Public Hearings.**

In projects involving the location of an airport, an airport runway, or a major runway extension, it has afforded the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of the airport or runway location and its consistency with goals and objectives of such planning as has been carried out by the community and it shall, when requested by the Secretary, submit a copy of the transcript of such hearings to the Secretary. Further, for such projects, it has on its management board either voting representation from the communities where the project is located or has advised the communities that they have the right to petition the Secretary concerning a proposed project.

10. **Metropolitan Planning Organization.**

In projects involving the location of an airport, an airport runway, or a major runway extension at a medium or large hub airport, the sponsor has made available to and has provided upon request to the metropolitan planning organization in the area in which the airport is located, if any, a copy of the proposed amendment to the airport layout plan to depict the project and a copy of any airport master plan in which the project is described or depicted.

11. **Pavement Preventive Maintenance.**

With respect to a project approved after January 1, 1995, for the replacement or reconstruction of pavement at the airport, it assures or certifies that it has implemented an effective airport pavement maintenance-management program and it assures that it will use such program for the useful life of any pavement constructed, reconstructed or repaired with Federal financial assistance at the airport. It will provide such reports on pavement condition and pavement management programs as the Secretary determines may be useful.

12. **Terminal Development Prerequisites.**

For projects which include terminal development at a public use airport, as defined in Title 49, it has, on the date of submittal of the project grant application, all the safety equipment required for certification of such airport under section 44706 of Title 49, United States Code, and all the security equipment required by rule or regulation, and

has provided for access to the passenger enplaning and deplaning area of such airport to passengers enplaning and deplaning from aircraft other than air carrier aircraft.

13. **Accounting System, Audit, and Record Keeping Requirements.**

    a. It shall keep all project accounts and records which fully disclose the amount and disposition by the recipient of the proceeds of this grant, the total cost of the project in connection with which this grant is given or used, and the amount or nature of that portion of the cost of the project supplied by other sources, and such other financial records pertinent to the project. The accounts and records shall be kept in accordance with an accounting system that will facilitate an effective audit in accordance with the Single Audit Act of 1984.

    b. It shall make available to the Secretary and the Comptroller General of the United States, or any of their duly authorized representatives, for the purpose of audit and examination, any books, documents, papers, and records of the recipient that are pertinent to this grant. The Secretary may require that an appropriate audit be conducted by a recipient. In any case in which an independent audit is made of the accounts of a sponsor relating to the disposition of the proceeds of a grant or relating to the project in connection with which this grant was given or used, it shall file a certified copy of such audit with the Comptroller General of the United States not later than six (6) months following the close of the fiscal year for which the audit was made.

14. **Minimum Wage Rates.**

    It shall include, in all contracts in excess of $2,000 for work on any projects funded under this grant agreement which involve labor, provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor, in accordance with the Davis-Bacon Act, as amended (40 U.S.C. 276a-276a-5), which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

15. **Veteran's Preference.**

    It shall include in all contracts for work on any project funded under this grant agreement which involve labor, such provisions as are necessary to insure that, in the employment of labor (except in executive, administrative, and supervisory positions), preference shall be given to Vietnam era veterans, Persian Gulf veterans, Afghanistan-Iraq war veterans, disabled veterans, and small business concerns owned and controlled by disabled veterans as defined in Section 47112 of Title 49, United States Code.  However, this preference shall apply only where the individuals are available and qualified to perform the work to which the employment relates.

16. **Conformity to Plans and Specifications.**

    It will execute the project subject to plans, specifications, and schedules approved by the Secretary. Such plans, specifications, and schedules shall be submitted to the Secretary prior to commencement of site preparation, construction, or other performance under this grant agreement, and, upon approval of the Secretary, shall be incorporated into this grant agreement. Any modification to the approved plans,

specifications, and schedules shall also be subject to approval of the Secretary, and incorporated into this grant agreement.

17. **Construction Inspection and Approval.**

It will provide and maintain competent technical supervision at the construction site throughout the project to assure that the work conforms to the plans, specifications, and schedules approved by the Secretary for the project. It shall subject the construction work on any project contained in an approved project application to inspection and approval by the Secretary and such work shall be in accordance with regulations and procedures prescribed by the Secretary. Such regulations and procedures shall require such cost and progress reporting by the sponsor or sponsors of such project as the Secretary shall deem necessary.

18. **Planning Projects.**

In carrying out planning projects:

a. It will execute the project in accordance with the approved program narrative contained in the project application or with the modifications similarly approved.

b. It will furnish the Secretary with such periodic reports as required pertaining to the planning project and planning work activities.

c. It will include in all published material prepared in connection with the planning project a notice that the material was prepared under a grant provided by the United States.

d. It will make such material available for examination by the public, and agrees that no material prepared with funds under this project shall be subject to copyright in the United States or any other country.

e. It will give the Secretary unrestricted authority to publish, disclose, distribute, and otherwise use any of the material prepared in connection with this grant.

f. It will grant the Secretary the right to disapprove the sponsor's employment of specific consultants and their subcontractors to do all or any part of this project as well as the right to disapprove the proposed scope and cost of professional services.

g. It will grant the Secretary the right to disapprove the use of the sponsor's employees to do all or any part of the project.

h. It understands and agrees that the Secretary's approval of this project grant or the Secretary's approval of any planning material developed as part of this grant does not constitute or imply any assurance or commitment on the part of the Secretary to approve any pending or future application for a Federal airport grant.

19. **Operation and Maintenance.**

a. The airport and all facilities which are necessary to serve the aeronautical users of the airport, other than facilities owned or controlled by the United States, shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal,

state and local agencies for maintenance and operation. It will not cause or permit any activity or action thereon which would interfere with its use for airport purposes. It will suitably operate and maintain the airport and all facilities thereon or connected therewith, with due regard to climatic and flood conditions. Any proposal to temporarily close the airport for non-aeronautical purposes must first be approved by the Secretary. In furtherance of this assurance, the sponsor will have in effect arrangements for-

1) Operating the airport's aeronautical facilities whenever required;

2) Promptly marking and lighting hazards resulting from airport conditions, including temporary conditions; and

3) Promptly notifying airmen of any condition affecting aeronautical use of the airport. Nothing contained herein shall be construed to require that the airport be operated for aeronautical use during temporary periods when snow, flood or other climatic conditions interfere with such operation and maintenance. Further, nothing herein shall be construed as requiring the maintenance, repair, restoration, or replacement of any structure or facility which is substantially damaged or destroyed due to an act of God or other condition or circumstance beyond the control of the sponsor.

b.  It will suitably operate and maintain noise compatibility program items that it owns or controls upon which Federal funds have been expended.

## 20. Hazard Removal and Mitigation.

It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

## 21. Compatible Land Use.

It will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft. In addition, if the project is for noise compatibility program implementation, it will not cause or permit any change in land use, within its jurisdiction, that will reduce its compatibility, with respect to the airport, of the noise compatibility program measures upon which Federal funds have been expended.

## 22. Economic Nondiscrimination.

a.  It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

b.  In any agreement, contract, lease, or other arrangement under which a right or privilege at the airport is granted to any person, firm, or corporation to conduct or

to engage in any aeronautical activity for furnishing services to the public at the airport, the sponsor will insert and enforce provisions requiring the contractor to-

1) furnish said services on a reasonable, and not unjustly discriminatory, basis to all users thereof, and

2) charge reasonable, and not unjustly discriminatory, prices for each unit or service, provided that the contractor may be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

c. Each fixed-based operator at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport and utilizing the same or similar facilities.

d. Each air carrier using such airport shall have the right to service itself or to use any fixed-based operator that is authorized or permitted by the airport to serve any air carrier at such airport.

e. Each air carrier using such airport (whether as a tenant, non-tenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and utilize similar facilities, subject to reasonable classifications such as tenants or non-tenants and signatory carriers and non-signatory carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

f. It will not exercise or grant any right or privilege which operates to prevent any person, firm, or corporation operating aircraft on the airport from performing any services on its own aircraft with its own employees [including, but not limited to maintenance, repair, and fueling] that it may choose to perform.

g. In the event the sponsor itself exercises any of the rights and privileges referred to in this assurance, the services involved will be provided on the same conditions as would apply to the furnishing of such services by commercial aeronautical service providers authorized by the sponsor under these provisions.

h. The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport.

i. The sponsor may prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

23. **Exclusive Rights.**

It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of the services at an airport by a single fixed-based operator shall not be construed as an exclusive right if both of the following apply:

a. It would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and

b. If allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport. It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities, including, but not limited to charter flights, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations, aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other aeronautical activity, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can be regarded as an aeronautical activity, and that it will terminate any exclusive right to conduct an aeronautical activity now existing at such an airport before the grant of any assistance under Title 49, United States Code.

24. **Fee and Rental Structure.**

It will maintain a fee and rental structure for the facilities and services at the airport which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport, taking into account such factors as the volume of traffic and economy of collection. No part of the Federal share of an airport development, airport planning or noise compatibility project for which a grant is made under Title 49, United States Code, the Airport and Airway Improvement Act of 1982, the Federal Airport Act or the Airport and Airway Development Act of 1970 shall be included in the rate basis in establishing fees, rates, and charges for users of that airport.

25. **Airport Revenues.**

a. All revenues generated by the airport and any local taxes on aviation fuel established after December 30, 1987, will be expended by it for the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport. The following exceptions apply to this paragraph:

1) If covenants or assurances in debt obligations issued before September 3, 1982, by the owner or operator of the airport, or provisions enacted before September 3, 1982, in governing statutes controlling the owner or operator's financing, provide for the use of the revenues from any of the airport owner or

operator's facilities, including the airport, to support not only the airport but also the airport owner or operator's general debt obligations or other facilities, then this limitation on the use of all revenues generated by the airport (and, in the case of a public airport, local taxes on aviation fuel) shall not apply.

2) If the Secretary approves the sale of a privately owned airport to a public sponsor and provides funding for any portion of the public sponsor's acquisition of land, this limitation on the use of all revenues generated by the sale shall not apply to certain proceeds from the sale.  This is conditioned on repayment to the Secretary by the private owner of an amount equal to the remaining unamortized portion (amortized over a 20-year period) of any airport improvement grant made to the private owner for any purpose other than land acquisition on or after October 1, 1996, plus an amount equal to the federal share of the current fair market value of any land acquired with an airport improvement grant made to that airport on or after October 1, 1996.

3) Certain revenue derived from or generated by mineral extraction, production, lease, or other means at a general aviation airport (as defined at Section 47102 of title 49 United States Code), if the FAA determines the airport sponsor meets the requirements set forth in Sec. 813 of Public Law 112-95.

b. As part of the annual audit required under the Single Audit Act of 1984, the sponsor will direct that the audit will review, and the resulting audit report will provide an opinion concerning, the use of airport revenue and taxes in paragraph (a), and indicating whether funds paid or transferred to the owner or operator are paid or transferred in a manner consistent with Title 49, United States Code and any other applicable provision of law, including any regulation promulgated by the Secretary or Administrator.

c. Any civil penalties or other sanctions will be imposed for violation of this assurance in accordance with the provisions of Section 47107 of Title 49, United States Code.

**26. Reports and Inspections.**

It will:

a. submit to the Secretary such annual or special financial and operations reports as the Secretary may reasonably request and make such reports available to the public; make available to the public at reasonable times and places a report of the airport budget in a format prescribed by the Secretary;

b. for airport development projects, make the airport and all airport records and documents affecting the airport, including deeds, leases, operation and use agreements, regulations and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request;

c. for noise compatibility program projects, make records and documents relating to the project and continued compliance with the terms, conditions, and assurances of this grant agreement including deeds, leases, agreements, regulations, and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request; and

d.  in a format and time prescribed by the Secretary, provide to the Secretary and make available to the public following each of its fiscal years, an annual report listing in detail:

   1)  all amounts paid by the airport to any other unit of government and the purposes for which each such payment was made; and

   2)  all services and property provided by the airport to other units of government and the amount of compensation received for provision of each such service and property.

## 27. Use by Government Aircraft.

It will make available all of the facilities of the airport developed with Federal financial assistance and all those usable for landing and takeoff of aircraft to the United States for use by Government aircraft in common with other aircraft at all times without charge, except, if the use by Government aircraft is substantial, charge may be made for a reasonable share, proportional to such use, for the cost of operating and maintaining the facilities used. Unless otherwise determined by the Secretary, or otherwise agreed to by the sponsor and the using agency, substantial use of an airport by Government aircraft will be considered to exist when operations of such aircraft are in excess of those which, in the opinion of the Secretary, would unduly interfere with use of the landing areas by other authorized aircraft, or during any calendar month that –

a.  Five (5) or more Government aircraft are regularly based at the airport or on land adjacent thereto; or

b.  The total number of movements (counting each landing as a movement) of Government aircraft is 300 or more, or the gross accumulative weight of Government aircraft using the airport (the total movement of Government aircraft multiplied by gross weights of such aircraft) is in excess of five million pounds.

## 28. Land for Federal Facilities.

It will furnish without cost to the Federal Government for use in connection with any air traffic control or air navigation activities, or weather-reporting and communication activities related to air traffic control, any areas of land or water, or estate therein, or rights in buildings of the sponsor as the Secretary considers necessary or desirable for construction, operation, and maintenance at Federal expense of space or facilities for such purposes. Such areas or any portion thereof will be made available as provided herein within four months after receipt of a written request from the Secretary.

## 29. Airport Layout Plan.

a.  It will keep up to date at all times an airport layout plan of the airport showing

   1)  boundaries of the airport and all proposed additions thereto, together with the boundaries of all offsite areas owned or controlled by the sponsor for airport purposes and proposed additions thereto;

   2)  the location and nature of all existing and proposed airport facilities and structures (such as runways, taxiways, aprons, terminal buildings, hangars and

roads), including all proposed extensions and reductions of existing airport facilities;

3) the location of all existing and proposed nonaviation areas and of all existing improvements thereon; and

4) all proposed and existing access points used to taxi aircraft across the airport's property boundary.  Such airport layout plans and each amendment, revision, or modification thereof, shall be subject to the approval of the Secretary which approval shall be evidenced by the signature of a duly authorized representative of the Secretary on the face of the airport layout plan. The sponsor will not make or permit any changes or alterations in the airport or any of its facilities which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport.

b. If a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary (1) eliminate such adverse effect in a manner approved by the Secretary; or (2) bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities except in the case of a relocation or replacement of an existing airport facility due to a change in the Secretary's design standards beyond the control of the airport sponsor.

30. **Civil Rights.**

It will promptly take any measures necessary to ensure that no person in the United States shall, on the grounds of race, creed, color, national origin, sex, age, or disability be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination in any activity conducted with, or benefiting from, funds received from this grant.

a. Using the definitions of activity, facility and program as found and defined in §§ 21.23 (b) and 21.23 (e) of 49 CFR § 21, the sponsor will facilitate all programs, operate all facilities, or conduct  all programs in compliance with all non-discrimination requirements imposed by, or pursuant to these assurances.

b. Applicability

1) Programs and Activities.  If the sponsor has received a grant (or other federal assistance) for any of the sponsor's program or activities, these requirements extend to all of the sponsor's programs and activities.

2) Facilities. Where it receives a grant or other federal financial assistance to construct, expand, renovate, remodel, alter or acquire a facility, or part of a facility, the assurance extends to the entire facility and facilities operated in connection therewith.

3) Real Property.  Where the sponsor receives a grant or other Federal financial assistance in the form of, or for the acquisition of real property or an interest in real property, the assurance will extend to rights to space on, over, or under such property.

c.  Duration.

The sponsor agrees that it is obligated to this assurance for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the assurance obligates the sponsor, or any transferee for the longer of the following periods:

1) So long as the airport is used as an airport, or for another purpose involving the provision of similar services or benefits; or

2) So long as the sponsor retains ownership or possession of the property.

d.  Required Solicitation Language. It will include the following notification in all solicitations for bids, Requests For Proposals for work, or material under this grant agreement and in all proposals for agreements, including airport concessions, regardless of funding source:

"The **(Name of Sponsor)**, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that any contract entered into pursuant to this advertisement, disadvantaged business enterprises and airport concession disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."

e.  Required Contract Provisions.

1) It will insert the non-discrimination contract clauses requiring compliance with the acts and regulations relative to non-discrimination in Federally-assisted programs of the DOT, and incorporating the acts and regulations into the contracts by reference in every contract or agreement subject to the non-discrimination in Federally-assisted programs of the DOT acts and regulations.

2) It will include a list of the pertinent non-discrimination authorities in every contract that is subject to the non-discrimination acts and regulations.

3) It will insert non-discrimination contract clauses as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a sponsor.

4) It will insert non-discrimination contract clauses prohibiting discrimination on the basis of race, color, national origin, creed, sex, age, or handicap as a

covenant running with the land, in any future deeds, leases, license, permits, or similar instruments entered into by the sponsor with other parties:

    a) For the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and

    b) For the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

f. It will provide for such methods of administration for the program as are found by the Secretary to give reasonable guarantee that it, other recipients, sub-recipients, sub-grantees, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the acts, the regulations, and this assurance.

g. It agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the acts, the regulations, and this assurance.

**31. Disposal of Land.**

a. For land purchased under a grant for airport noise compatibility purposes, including land serving as a noise buffer, it will dispose of the land, when the land is no longer needed for such purposes, at fair market value, at the earliest practicable time. That portion of the proceeds of such disposition which is proportionate to the United States' share of acquisition of such land will be, at the discretion of the Secretary, (1) reinvested in another project at the airport, or (2) transferred to another eligible airport as prescribed by the Secretary.  The Secretary shall give preference to the following, in descending order, (1) reinvestment in an approved noise compatibility project, (2) reinvestment in an approved project that is eligible for grant funding under Section 47117(e) of title 49 United States Code, (3) reinvestment in an approved airport development project that is eligible for grant funding under Sections 47114, 47115, or 47117 of title 49 United States Code, (4) transferred to an eligible sponsor of another public airport to be reinvested in an approved noise compatibility project at that airport, and (5) paid to the Secretary for deposit in the Airport and Airway Trust Fund.  If land acquired under a grant for noise compatibility purposes is leased at fair market value and consistent with noise buffering purposes, the lease will not be considered a disposal of the land.  Revenues derived from such a lease may be used for an approved airport development project that would otherwise be eligible for grant funding or any permitted use of airport revenue.

b. For land purchased under a grant for airport development purposes (other than noise compatibility), it will, when the land is no longer needed for airport purposes, dispose of such land at fair market value or make available to the Secretary an amount equal to the United States' proportionate share of the fair market value of the land.  That portion of the proceeds of such disposition which is proportionate to the United States' share of the cost of acquisition of such land will, (1) upon application to the Secretary, be reinvested or transferred to another

eligible airport as prescribed by the Secretary.  The Secretary shall give preference to the following, in descending order: (1) reinvestment in an approved noise compatibility project, (2) reinvestment in an approved project that is eligible for grant funding under Section 47117(e) of title 49 United States Code, (3) reinvestment in an approved airport development project that is eligible for grant funding under Sections 47114, 47115, or 47117 of title 49 United States Code, (4) transferred to an eligible sponsor of another public airport to be reinvested in an approved noise compatibility project at that airport, and (5) paid to the Secretary for deposit in the Airport and Airway Trust Fund.

c.   Land shall be considered to be needed for airport purposes under this assurance if (1) it may be needed for aeronautical purposes (including runway protection zones) or serve as noise buffer land, and (2) the revenue from interim uses of such land contributes to the financial self-sufficiency of the airport. Further, land purchased with a grant received by an airport operator or owner before December 31, 1987, will be considered to be needed for airport purposes if the Secretary or Federal agency making such grant before December 31, 1987, was notified by the operator or owner of the uses of such land, did not object to such use, and the land continues to be used for that purpose, such use having commenced no later than December 15, 1989.

d.   Disposition of such land under (a) (b) or (c) will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with operation of the airport.

32. **Engineering and Design Services.**

It will award each contract, or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping or related services with respect to the project in the same manner as a contract for architectural and engineering services is negotiated under Title IX of the Federal Property and Administrative Services Act of 1949 or an equivalent qualifications-based requirement prescribed for or by the sponsor of the airport.

33. **Foreign Market Restrictions.**

It will not allow funds provided under this grant to be used to fund any project which uses any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

34. **Policies, Standards, and Specifications.**

It will carry out the project in accordance with policies, standards, and specifications approved by the Secretary including but not limited to the advisory circulars listed in the Current FAA Advisory Circulars for AIP projects, dated _____ (the latest approved version as of this grant offer) and included in this grant, and in accordance

with applicable state policies, standards, and specifications approved by the Secretary.

35. **Relocation and Real Property Acquisition.**

   a. It will be guided in acquiring real property, to the greatest extent practicable under State law, by the land acquisition policies in Subpart B of 49 CFR Part 24 and will pay or reimburse property owners for necessary expenses as specified in Subpart B.
   b. It will provide a relocation assistance program offering the services described in Subpart C and fair and reasonable relocation payments and assistance to displaced persons as required in Subpart D and E of 49 CFR Part 24.
   c. It will make available within a reasonable period of time prior to displacement, comparable replacement dwellings to displaced persons in accordance with Subpart E of 49 CFR Part 24.

36. **Access By Intercity Buses.**

   The airport owner or operator will permit, to the maximum extent practicable, intercity buses or other modes of transportation to have access to the airport; however, it has no obligation to fund special facilities for intercity buses or for other modes of transportation.

37. **Disadvantaged Business Enterprises.**

   The sponsor shall not discriminate on the basis of race, color, national origin or sex in the award and performance of any DOT-assisted contract covered by 49 CFR Part 26, or in the award and performance of any concession activity contract covered by 49 CFR Part 23.  In addition, the sponsor shall not discriminate on the basis of race, color, national origin or sex  in the administration of its DBE and ACDBE programs or the requirements of 49 CFR Parts 23 and 26.  The sponsor shall take all necessary and reasonable steps under 49 CFR Parts 23 and 26 to ensure nondiscrimination in the award and administration of DOT-assisted contracts, and/or concession contracts.  The sponsor's DBE and ACDBE programs, as required by 49 CFR Parts 26 and 23, and as approved by DOT, are incorporated by reference in this agreement.  Implementation of these programs is a legal obligation and failure to carry out its terms shall be treated as a violation of this agreement.  Upon notification to the sponsor of its failure to carry out its approved program, the Department may impose sanctions as provided for under Parts 26 and 23 and may, in appropriate cases, refer the matter for enforcement under 18 U.S.C. 1001 and/or the Program Fraud Civil Remedies Act of 1936 (31 U.S.C. 3801).

38. **Hangar Construction.**

   If the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose.

39. **Competitive Access.**

a. If the airport owner or operator of a medium or large hub airport (as defined in section 47102 of title 49, U.S.C.) has been unable to accommodate one or more requests by an air carrier for access to gates or other facilities at that airport in order to allow the air carrier to provide service to the airport or to expand service at the airport, the airport owner or operator shall transmit a report to the Secretary that-

   1) Describes the requests;

   2) Provides an explanation as to why the requests could not be accommodated; and

   3) Provides a time frame within which, if any, the airport will be able to accommodate the requests.

b. Such report shall be due on either February 1 or August 1 of each year if the airport has been unable to accommodate the request(s) in the six month period prior to the applicable due date.

EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

COMMITTEE TO STOP AIRPORT
EXPANSION, et al.,

                Plaintiffs,

     v.

DEPARTMENT OF TRANSPORTATION,
et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SETTLEMENT
AGREEMENT

Civil Action
No.  CV-03-2634

(Seybert, J.)
(M. Orenstein,  M.J.)

## SETTLEMENT AGREEMENT

       WHEREAS,  on January 10, 1989, the East Hampton Town Board passed Resolution No. 145, wherein it adopted the Master Plan Update for East Hampton Airport ("the 1989 Master Plan") with certain amendments that are set forth in the Resolution No. 145 (a copy of the Master Plan Update as adopted and Resolution No. 145 are attached hereto as Exhibit A); and

       WHEREAS, on December 15, 1989, the East Hampton Town Board passed Resolution No. 2020 wherein it approved an Airport Layout Plan (the "1989 ALP") for the East Hampton Airport and authorized Pat Trunzo, III, the then Deputy Supervisor, to sign the 1989 ALP; and

       WHEREAS, on December 19, 1989, Pat J. Trunzo, III signed the 1989 ALP on behalf of the East Hampton Town Board (a copy of the Airport Layout Plan, as adopted and signed, is attached hereto as Exhibit B); and

       WHEREAS, by letter dated September 5, 1990 from Mr. Phillip Brito to Mr.

Tony Bullock, the Federal Aviation Administration ( "FAA") conditionally approved the 1989 ALP (a copy of which letter is attached hereto as Exhibit C); and

WHEREAS, in 2001 the FAA did not have in its possession a signed copy of the 1989 ALP and the FAA asked the Town to furnish a signed copy thereof; and

WHEREAS, the East Hampton Town Board, on August 3, 2001, adopted Resolution No. 1023, wherein it authorized the re-signing of the ALP adopted in 1989 and the submission of the re-signed ALP (the "2001 ALP") to the FAA; and

WHEREAS, in August 2001, the Town of East Hampton submitted the 2001 ALP to the FAA (a copy of which is attached hereto as Exhibit D) and represented that the 2001 ALP was a true copy of the 1989 ALP; and

WHEREAS, according to published reports, in December of 2002 or January of 2003 in response to a federal subpoena, the Town of East Hampton produced a copy of the 1989 ALP that included the signature of Pat J. Trunzo, III; and

WHEREAS, Plaintiffs allege that a comparison of the airport layout plan produced by the Town in response to the subpoena and the 2001 ALP demonstrates that the 2001 ALP is not in fact a true copy of the 1989 ALP; and

WHEREAS, to the best of the knowledge, information, and belief of the FAA, the approval of an ALP by the East Hampton Town Board may only be affected by resolution of the Town Board; and

WHEREAS, to the best of the knowledge, information and belief of the FAA, since December 15, 1989 there has been no resolution of the East Hampton Town Board approving an ALP for the East Hampton Airport other than the 1989 ALP; and

WHEREAS, in this action Plaintiffs seek review of the determination by the FAA

2

in 2001 to approve the 2001 ALP; and

WHEREAS, the Plaintiffs submitted several Freedom of Information Act requests to the FAA concerning the East Hampton Airport prior to the initiation of the above-captioned action; and

WHEREAS, the parties desire to resolve this action and the issues between them without further litigation;

IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiffs and Defendants ("the parties"), that the above-captioned action shall be settled and compromised on the following terms and conditions:

1. Plaintiffs will file a Rule 41(a) stipulation of dismissal whereby the above-captioned action would be dismissed with prejudice, and without costs and fees to any party, provided that Plaintiffs' obligation to file such a stipulation shall not arise until the Defendants or their counsel sign this Agreement. Plaintiffs agree to file such stipulation within ten business days of receipt of Defendants' executed signature page.

2. Plaintiffs will submit to the United States District Court for the District of Columbia a Rule 41(a) stipulation of dismissal, with prejudice and without costs and fees to any party, of the action entitled *Committee to Stop Airport Expansion, et al. v. United States Department of Transportation, et al.*, Civil Action No. 02-0619 (JR) following receipt of the Court's order dismissing Civil Action No. CV-03-2634 (Seybert, J.) and execution by the parties of a stipulation of dismissal of Civil Action No. 02-0619 (JR).

3. Plaintiffs will submit a request seeking dismissal, with prejudice and without costs and fees to any party, of the proceeding entitled *Committee to Stop Airport Expansion v. Town of East Hampton*, FAA Docket No. 16-02-04 to Defendant FAA within ten

3

days of receipt by Plaintiffs' counsel of an order dismissing Civil Action No. 03-2634.

Defendant FAA agrees that upon receipt of such request,  it will withdraw the order of dismissal

dated June 24, 2002 in FAA Docket No. 16-02-04.

    4.  Defendant FAA agrees that it will not assert, agree or conclude in any

subsequent proceeding, including during its consideration of a request for federal financial

assistance, that any master plan concerning the East Hampton Airport other than the 1989 Master

Plan as modified by the Town Board in Town Resolution No. 145, which plan and resolution are

attached as Exhibit A, is a master plan approved by the Town of East Hampton unless Defendant

FAA obtains or is presented with a certified copy of the resolution of the Town Board adopted

subsequent to the effective date of this Agreement approving such master plan.  Defendant FAA

also agrees that it will not assert, agree or conclude in any subsequent proceeding, including

during its consideration of a request for federal financial assistance, that any airport layout plan

concerning the East Hampton Airport, other than the 1989 ALP which is attached as Exhibit B, is

an airport  layout plan approved by the Town of East Hampton unless Defendant FAA obtains or

is presented with a certified copy of the resolution of the Town Board adopted subsequent to the

effective date of this Agreement approving such airport layout plan.  Defendant FAA agrees that

the 1989 ALP does not, as of the date hereof, constitute a "current" airport layout plan within the

meaning of applicable federal law and; therefore, is not a legally acceptable basis for any federal

financial assistance, including airport improvement grants, issued subsequent to the effective

date of this Agreement.

    5.  Defendant FAA will not award federal financial assistance, including

grants, to the Town of East Hampton for the East Hampton Airport unless the application for

federal financial assistance is based upon an airport layout plan for the East Hampton Airport

that was adopted by resolution of the East Hampton Town Board and in a manner consistent with applicable law.

6.      Through and including December 31, 2009, Defendant FAA will require that applications for federal financial assistance, including grants, from the Town of East Hampton for the East Hampton Airport include a copy of the Town Board Resolution approving the airport layout plan that is submitted to the FAA and a certified copy of the Town Board Resolution approving the submission of the application itself, except that the requirement to submit a copy of the Town Board resolution approving the extant airport layout plan shall not apply to a request for funding to develop a new or revised airport layout plan.

7.      Defendant FAA agrees, with respect to East Hampton Airport grants issued prior to the effective date of this Agreement, that the following grant assurances will not be enforced beyond December 31, 2014:

- It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport (grant assurance 22.a.).

- The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport (grant assurance 22.h).

- It will keep up to date at all times an airport layout plan of the airport showing; (1) boundaries of the airport and all proposed additions thereto, together with the boundaries of all offsite areas owned or controlled by the sponsor for airport purposes and proposed additions thereto; (2) the location and nature of all existing and proposed airport facilities and structures (such as runways, taxiways, aprons, terminal buildings, hangars and roads), including all proposed extensions and reductions of existing airport facilities; and (3) the location of all existing and proposed nonaviation areas and of all existing improvements thereon. Such airport layout plans and each amendment, revision, or modification thereof, shall be subject to the approval of the Secretary which approval shall be evidenced by the signature of a duly authorized representative of the Secretary on the face of the airport layout plan. The sponsor will not make or permit any changes or alterations in the airport or any of its facilities which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the

opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport (grant assurance 29.a.).

- If a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary; (1) eliminate such adverse effect in a manner approved by the Secretary; or (2) bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities (grant assurance 29.b.).

Notwithstanding the foregoing, Defendant FAA reserves its right to take action as provided in grant assurance 29 if the Town of East Hampton takes an action or proposes to take an action that will adversely affect the safety of the East Hampton Airport.  All other grant assurances with respect to any grant awarded to the East Hampton Airport, and all grant assurances with respect to any grant awarded after the effective date of this Agreement, including grant assurances 22.a and 22.h and grant assurance 29, shall be enforced in full.

    8.  a)  Plaintiffs will file a request pursuant to the Freedom of Information Act, 5 U.S.C. § 552, 49 C.F.R. Part 7, in the form attached as Exhibit E (the "FOIA request"), within ten (10) business days of the execution of this Settlement Agreement.

      (b)  Defendant FAA will respond to the FOIA request within seventy-five (75) days of receipt by the FAA of the FOIA request and will send the response to the undersigned counsel for Plaintiffs.  Defendant FAA agrees that any record within the scope of the FOIA request that is withheld by Defendant FAA on the grounds that it is exempt from disclosure will be identified on a list or log and that list or log will be provided to Plaintiffs' counsel within 105 days of receipt of the FOIA request.  Defendant FAA also agrees that the FAA Regional Counsel's Office ("FAA counsel") will review any record so withheld and listed and will provide Plaintiffs' counsel with a written statement informing Plaintiffs as to whether

FAA counsel agrees that such record is properly withheld. The parties agree that the records on the list or log shall be identified by providing the name of the author(s), the name of the intended and actual recipients, the date of the record, the type of record and the reason why the record was withheld.

        (c)      The parties agree that Plaintiffs may appeal the determination of Defendant FAA by: (1) submitting a written appeal to the Assistant Administrator for Regions and Center Operations, FAA Headquarters, 800 Independence Avenue, S.W., Washington, D.C., 20591; (2) submitting the appeal within thirty (30) days of receipt by Plaintiffs' counsel of the response of Defendant FAA to the FOIA request or the FAA counsel's written statement, whichever occurs last in time, (3) referencing the FOIA Control Number, and including all information and arguments relied upon in support of the appeal in the submission to the Assistant Administrator for Regions and Center Operations; (4) indicating that it is an appeal from a denial of a request under the Freedom of Information Act; and (5) prominently marking the envelope in which the appeal is sent as "FOIA Appeal." Defendant FAA agrees that any determination of the Assistant Administrator concerning such appeal will be sent to the undersigned counsel for Plaintiffs.

        (d)      The parties agree that within forty-five (45) days of receipt by Plaintiffs' counsel of a determination by the Assistant Administrator, Plaintiffs may request that this Court determine whether there has been a failure by Defendant FAA to comply with the Freedom of Information Act with respect to the FOIA request. The parties agree that the Court shall retain jurisdiction to determine any issues raised by the FAA response to the FOIA request, if such request is filed with the Court within forty-five (45) days of receipt of the Assistant Administrator's determination by Plaintiffs' counsel. The parties also agree that the Court's

review of the Assistant Administrator's determination and the nature of the relief available shall be governed by the Freedom of Information Act.

(e)     The parties agree that this Paragraph 8 shall not be construed to afford Plaintiffs any rights beyond those provided in the Freedom of Information Act.

9.     Nothing herein, or in the settlement hereof, shall in any way be deemed an admission or evidence of wrongdoing or liability on the part of the Defendants, including agents, officers, assigns, employees and representatives, past and present.

10.     Plaintiffs and Defendants understand and agree that this Agreement contains the entire agreement between the parties, and no statements, representations, promises, agreements or negotiations, oral or otherwise, between the parties or their counsel which are not included herein shall be of any force or effect.

11.     The effective date of this Agreement shall be the date that the document is signed by the party who signs it last in time.

COMMITTEE TO STOP AIRPORT EXPANSION

By: _Edward Gorman_____
      Edward Gorman

Dated: January _27_, 2005


EDWARD GORMAN

By: _Edward Gorman_____
      Edward Gorman
      68 Huckleberry Lane
      East Hampton, NY   11937

Dated: January _27_, 2005

8

PAT TRUNZO, JR.

By: _____
    Pat Trunzo, Jr.
    148 Buckskill Road
    East Hampton, NY   11937

Dated:  January 27th, 2005


PAT J. TRUNZO, III

By: _____
    Pat J. Trunzo, III
    10 Cedar Trail
    East Hampton, NY   11937

Dated:  January 27th, 2005


COUNSEL FOR PLAINTIFFS

_____
Sheila D. Jones, Esquire
(Admitted Pro Hac Vice)
Akin Gump Strauss Hauer & Feld  LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564

Dated: ~~January~~ April 29, 2005, 2005


UNITED STATES OF AMERICA

Roslynn R. Mauskopf
United States Attorney
Eastern District of New York
Attorney for Defendants
610 Federal Plaza
Central Islip, New York 11722-4454

Dated:  January _____, 2005

By: _____
    Kevin P. Mulry  (KM 3752)
    Assistant U.S. Attorney


9

PAT TRUNZO, JR.

By:_____
    Pat Trunzo, Jr.
    148 Buckskill Road
    East Hampton, NY   11937

Dated:  January _____, 2005


PAT J. TRUNZO, III

By:_____
    Pat J. Trunzo, III
    10 Cedar Trail
    East Hampton, NY   11937

Dated:  January _____, 2005

COUNSEL FOR PLAINTIFFS


_____
Sheila D. Jones, Esquire
(Admitted Pro Hac Vice)
Akin Gump Strauss Hauer & Feld  LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564

Dated:  January _____, 2005


UNITED STATES OF AMERICA

Roslynn R. Mauskopf
United States Attorney
Eastern District of New York
Attorney for Defendants
610 Federal Plaza
Central Islip, New York 11722-4454

Dated:  ~~January~~ APRIL 11, 2005

By:  _Kevin P. Mulry_
    Kevin P. Mulry  (KM 3752)
    Assistant U.S. Attorney

9

**Exhibit E**

Federal Aviation Administration

National Freedom of Information Act Staff, ARC-40

800 Independence Ave., SW

Washington, DC 20591

Dear [Insert name]:

      This firm represents the Committee to Stop Airport Expansion with respect to certain matters relating to the East Hampton Airport located in the Town of East Hampton, New York (airport identifier: HTO).  Pursuant to the Freedom of Information Act , 5 U.S.C.§ 552,  and the settlement agreement executed by the parties in *Committee to Stop Airport Expansion, et al. v. U.S. Department of Transportation, et al., Civil Action,* No. CV-03-2634 (E.D.N.Y.), we request the following documents and records:

      all records and documents referring or relating to the East Hampton Airport from January 1, 1988 to December 31, 2003, that were received by, issued by or created by the following organizational units of the Federal Aviation Administration's Eastern Region (and all organizational units reporting to such organizational units);  Airports Division(AEA-600), including without limitation the New York Airports District Office; the Airway Facilities Division (AEA-400); the New York NAS Implementation Center (ANI-200); the NY Flight Procedures Office (NYFPO); the  Flight Standards Division (AEA-200); the Air Traffic Division (AEA-500); the Office of the Runway Safety Program Manager, and the Office of the Regional Administrator (AEA-1).  In addition, the requester seeks documents and records referring or relating to the East Hampton Airport that were received, issued by or created by the Office of the Associate Administrator for Airports (ARP-1), Office of Airport Safety and Standards (AAS), and the Office of Airport Planning and Programming (APP), each of which are located at FAA National Headquarters, Washington, D.C.

For the purposes of this request, as defined in the U.S. Department of Transportation's regulation implementing FOIA, 49 C.F.R. Part 7, the term "record" includes "any writing, drawing, map, recording, tape, film, photograph, or other documentary material by which information is preserved.  The term also includes any such documentary material stored by computer."  49 CFR §7.2.  Also for the purposes of this request, "record" and "document" mean draft versions, final versions and all attachments or exhibits to such "records" and "documents."

EXHIBIT C

**FAA Responses to Questions from Rep. Tim Bishop**
**East Hampton Airport**

Question 1:  In the absence of FAA Grant Assurances, are municipal restrictions to mitigate or reduce noise impacts on the surrounding community permissible?  If not, under what basis in law does the FAA assert the Town of East Hampton's proprietary powers are restricted in the absence of specific Grant Assurances?

FAA Response:  The FAA's role is to advise sponsors subject to Grant Assurance obligations concerning proposed actions to facilitate their compliance with applicable Federal laws (see FAA Order 5190.6B, Airport Compliance Manual).  Particularly absent such obligations, the FAA does not typically provide advisory opinions about hypothetical situations.  Rather, the FAA provides an opinion when requested by a Federal court and determines on a case-by-case basis whether and to what extent to participate when requested by private parties.  See title 49 Code of Federal Regulations, part 9, generally.  As a rule, nonfederally obligated airport operators obtain advice from private counsel concerning the scope of their proprietary authority.

The issue presented here relating to the "absence of FAA Grant Assurances" is a novel one, of first impression, because the FAA is a party to a settlement agreement under which two of the nine provisions comprising the economic nondiscrimination Grant Assurance and Grant Assurance 29, with one exception not relevant here, will expire at HTO after December 31, 2014.  The FAA further agreed not to enforce the expiring provisions after December 31, 2014.  The town of East Hampton will generally otherwise remain grant obligated until 2021.  Under the settlement agreement, all grants awarded to HTO after 2005 will include Grant Assurances 22a, 22h, and 29.  For purposes of answering this question, it is assumed that no new grants have been awarded and that the town is proposing to restrict access after December 31, 2014.

The FAA's agreement not to enforce means that as of December 31, 2014, unless and until the FAA awards a new grant to the town, the FAA will not initiate or commence an administrative grant enforcement proceeding in response to a complaint from aircraft operators under title 14 CFR, part 16, or seek specific performance of Grant Assurances 22a, 22h, and 29.

The FAA's agreement not to enforce also means that unless the town wishes to remain eligible to receive future grants of Federal funding, it is not required to comply with the requirements under the Airport Noise and Capacity Act of 1990 (ANCA), as implemented by title 14 CFR, part 161, in proposing new airport noise and access restrictions.  See title 49 United States Code (U.S.C.), § 47524(e).  ANCA applies to restrictions affecting operations by any Stage 2 or Stage 3 aircraft (including helicopters) if the restriction was not in effect on October 1, 1990[1] (title 49 U.S.C., § 47524(b), (c)).

---

[1] Restrictions on operations of Stage 3 aircraft in effect on October 1, 1990, are "grandfathered" and are not subject to the requirements of ANCA (see title 49 U.S.C., § 47524(c)).  Amendments to "grandfathered" restrictions that further reduce or limit Stage 3 aircraft operations or affect aircraft safety are subject to part 161 (title 49 U.S.C., § 47524(d)(4)).

Under ANCA, prior to implementing a restriction on Stage 3 aircraft, an airport operator must provide notice to the public.   This includes a clear, concise description of the proposed restriction, an opportunity to comment, and an adequate environmental assessment.   The airport operator's analysis must provide substantial evidence supporting the following six statutory conditions:

(1) The restriction is reasonable, nonarbitrary, and nondiscriminatory;

(2) the restriction does not create an undue burden on interstate or foreign commerce;

(3) the restriction is not inconsistent with maintaining the safe and efficient use of the navigable airspace;

(4) the restriction does not conflict with a law or regulation of the United States;

(5) an adequate opportunity has been provided for public comment on the restriction; and

(6) the restriction does not create an undue burden on the national aviation system.

Title 49 U.S.C., § 47524(c)(2)(A)-(F).

Although FAA approval is not required for an airport operator to implement a Stage 2 restriction, an airport operator must provide an analysis of the proposed restriction, as well as a public notice and opportunity to comment, at least 180 days prior to the effective date of the restriction.   The analysis must include a benefit-cost analysis; a description of alternative measures considered that do not involve aircraft restrictions (including a benefit-cost analysis of such alternatives).

We are responding to the balance of your question because the town is partially grant obligated and it raises an unusual issue.   It is well settled that airport operators have limited proprietary authority to restrict access to control noise.   Whether or not they have accepted grants from the FAA, they are vested only with the power to promulgate reasonable, nonarbitrary, and nondiscriminatory regulations that establish acceptable noise levels for the airport and its immediate environs.   Any other conduct by an airport proprietor would frustrate the statutory scheme and unconstitutionally burden the commerce Congress sought to foster.   *British Airways Board* v. *Port Authority of New York and New Jersey*, 558 F.2d 75, 84 (2d Cir. 1977), *aff'd, as modified*, 564 F.2d 1002 (2d Cir. 1977) (*British Airways I and II*) (see § 3, Authorities and Responsibilities–Legal Framework, Aviation Noise Abatement Policy 2000, 65 Fed. Reg. 43,802-01 (July 14, 2000)).

In the opinion of the FAA, should the town of East Hampton propose any restriction that denies access on fair and reasonable grounds or is unjustly discriminatory at HTO, the aforementioned Federal and constitutional law would provide a basis for aircraft operators to prevail in seeking a declaratory judgment and injunction.   This basis is independent of Grant Assurances 22a, 22h, and 29.   In such circumstances, the United States would have to determine whether affirmative litigation could and should be initiated on that same basis consistent with the terms of the settlement agreement.

Question 2:  Barring emergency situations, in the absence of FAA Grant Assurances, is it correct that a municipal owner of a general aviation airport may do the following things for the specific purpose of protecting the community from noise?  If not, please clarify.
- Limit hours of operation, including imposing curfews or closing on weekends;
- Limit the number of airport operations per day;
- Exclude particular aircraft types based on associate noise levels.

FAA Response:  See response to Question 1.  Any restriction must, consistent with Federal and constitutional law, be reasonable, nonarbitrary, and nondiscriminatory, establishing acceptable noise levels for the airport and its immediate environs.  Any other conduct by an airport proprietor would frustrate the statutory scheme and unconstitutionally burden the commerce Congress sought to foster.

Question 3:  According to local organizations, 37 out of 39 Grant Assurance at East Hampton Airport will remain in effect until 2021; however, Grant Assurance 22a and 22h and 29a and 29b – the assurances that allow the FAA to substitute its view of the need for noise restrictions for that of the Town as airport proprietor – will become unenforceable, by agreement, on December 31, 2014.  Is this correct.  If not, please clarify.

FAA Response:  According to the settlement agreement, two of the nine subsections comprising of Grant Assurance 22 (Economic Nondiscrimination) will expire after December 31, 2014, as would Grant Assurance 29 (Airport Layout Plan) with one exception.  The two subsections that expire are 22a and 22h.  These subsections address access restrictions.  The settlement agreement states that the FAA agrees to take no action to enforce Grant Assurances 22a, 22h, 29a, and 29b (except where the town takes an action or proposes to take an action that will adversely affect the safety of the airport) after December 31, 2014.  As discussed in detail in response to Questions 1 and 2, the Grant Assurances relating to airport noise and access parallel existing requirements under current Federal and constitutional law.  From a legal perspective, airport operators have limited proprietary authority to restrict access as a means of reducing aircraft noise impacts in order to improve compatibility with the local community.  This limitation applies to the same degree whether or not the airport operator has accepted grants of Federal funding from the FAA.  Should the town and the FAA have a difference of opinion concerning whether proposed restrictions exceed this limitation, it is an open question whether the United States could and would initiate affirmative litigation after Grant Assurances 22a, 22h, and 29 expire in December 2014.  The issue in any court proceeding, whether brought by private parties or the United States, would be the same:  whether the noise restriction adopted by the town is reasonable, nondiscriminatory, and justified.  The assurances, which reflect limitations in applicable Federal and constitutional law, do not "allow the FAA to substitute its view of the need for noise restrictions for that of the town as proprietor."

Question 4:  Should the town of East Hampton apply for and receive additional AIP funds, would the town be [by] restricted by a new set of Grant Assurances that would prevent them [that] from implementing noise reduction policies, such as those that are currently in effect.

FAA Response:  The settlement agreement specifically states that all grants awarded to HTO after the effective date of the settlement agreement (April 2005) would include Grant

Assurances 22a, 22h, and 29a.  By law, any future grant executed by the town must include all Grant Assurances in effect at the time of the grant.  The town currently has voluntary noise abatement helicopter routes in effect.  We see no reason that a new set of Grant Assurances would prevent continued use of these routes.  Nor would new assurances impede any reasonable restriction that complies with other applicable Federal and constitutional law.

The FAA has continuously, consistently, and actively encouraged a balanced approach to address noise problems and to discourage unreasonable and unwarranted airport use restrictions.  It is a longstanding FAA policy that all possible measures to reduce noise should be considered before airport noise restrictions are proposed to provide noise relief.  An airport operator's efforts at land use control are factors to be considered in determining whether there are nonaircraft restrictions that could achieve noise benefits more effectively than a restriction.  The ability of an airport operator to attain the benefits of an access restriction through the exercise of land use control powers may be a factor to be considered in determining the reasonableness of a restriction.  Voluntary measures, such as asking flight crews to expedite climbs (safely) or apply airport specific noise procedures, are inherently reasonable elements of a balanced approach.  The FAA would encourage HTO to continue to work with aircraft operators to ensure voluntary measures are communicated and implemented, as well as educate users on the importance of participating in such voluntary abatement programs for the mutual benefit of the airport and the community.

Question 5:  According to *National Helicopter Corp. of America v. The City of New York*, 137 F. 2d 81 (2d Circuit, 1998), any restriction properly adopted in the exercise of its powers as a proprietor cannot violate the Commerce Clause of the U.S. Constitution and that the proprietor's exception is an exception to federal control of airspace management.  Does the FAA agree that use restrictions that are reasonably related [to] the legitimate local interest in limiting noise are not an unconstitutional interference with either interstate commerce or federal control of the airways?

FAA Response: The cited case, to which the United States was not a party, raises issues of Federal authority under the dormant Commerce Clause and implied preemption.  Cases invoking these legal doctrines are very fact-specific and the legal issues raised can be complex.  Under these circumstances, it would not be appropriate for the FAA to opine hypothetically.

Question 6:  In the absence of specific Grant Assurances, on what basis could the FAA bring suit on the town of East Hampton for enacting noise reduction policies at the East Hampton Airport, such as limits on hours of operation and imposing curfews or closing on weekends?

FAA Response:  See response to Question 1.

Question 7:  Does the Town of East Hampton have an FAA approved Airport Layout Plan (ALP)?  If so, when was it most recently approved by the FAA?

FAA Response:  Yes, the FAA's New York Airports District Office received a revised ALP and conditionally approved it on September 6, 2011.

<u>Question 8</u>:  The 65 DNL decibel contour in East Hampton is within the boundaries of the East Hampton Airport itself.  Given this fact, are there any conditions under which the FAA would consent to use restrictions in order to reduce noise in the community?

FAA Response:  See responses to Questions 1 and 4.  The FAA consents to reasonable, nonarbitrary, and nondiscriminatory restrictions that establish acceptable noise levels for the airport and its immediate environs.  Title 14 CFR, part 161, provides detailed information about how the FAA evaluates potential noise benefits in reviewing proposed airport noise and access restrictions.  In proposing restrictions, just as it does in proposing measures to increase airport noise compatibility under title 14 CFR, part 150, the town would have the flexibility to supplement day/night average sound level with other noise analyses.  As discussed in response to Question 4, the Town should consider measures to reduce noise in the community other than use restrictions.   The Town may apply for and receive grants of federal funding to sound insulate homes subject to noise levels below 65 DNL dB.  To qualify the Town would have to conduct an airport noise compatibility planning study under Part 150 to explore a range of alternative noise abatement measures and adopt a standard for local land use compatibility lower than 65 DNL dB.